UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: _____

ANNE LEMASTER,

    Plaintiff,

v.

OFFICE OF CRIMINAL CONFLICT
AND CIVIL REGIONAL COUNSEL,
FOURTH DISTRICT OF FLORIDA

    Defendant.
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, ANNE LEMASTER, by and through her undersigned counsel, sues the Defendant, OFFICE OF CRIMINAL CONFLICT AND CIVIL REGIONAL COUNSEL, and alleges as follows:

**JURISDICTION AND VENUE**

1. This is an action for damages and to remedy violations of the rights of ANNE LEMASTER under Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Florida Civil Rights Act of 1992, as amended ("Chapter 760" or the "FCRA"), to redress injuries done to her by the Defendant, OFFICE OF CRIMINAL CONFLICT AND CIVIL REGIONAL COUNSEL, FOURTH DISTRICT OF FLORIDA ("Defendant").

2. The unlawful acts which gave rise to this Complaint occurred within Broward County, Florida during the Plaintiff's employment with Defendant, making venue proper in this District pursuant to 28 U.S.C. § 1391.

1

## PARTIES

3. At all times material hereto, Plaintiff has been a citizen and resident of Broward County Florida and is otherwise *sui juris*.

4. As a female, Plaintiff is a member of a protected class under Title VII and Chapter 760, because the terms, conditions, and privileges of her employment were altered because of her gender.

5. Defendant is a government agency. At all times material hereto, Defendant was Plaintiff's employer as defined by law.

6. Defendant has, at all times material hereto, employed 15 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year in accordance with Title VII and Chapter 760 (42 U.S.C. §2000e(b); Fla. Stat. § 760.02(7)).

7. Plaintiff has exhausted her administrative remedies by filing a timely charge of discrimination against the Defendant with the Equal Employment Opportunity Commission, which was dually filed with the Florida Commission on Human Relations.

8. Plaintiff's charge was filed within 300 days after the first instance of discrimination occurred.

9. Plaintiff was issued a Notice of Right to Sue on March 8, 2021. This suit is filed in accordance with that Notice and within the applicable ninety (90) day limitation (a copy of the Notice is attached hereto as Exhibit "A").

10. The Florida Commission on Human Relations did not issue a finding on Plaintiff's charge within 180 days of the filing of said charges.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

11. Defendant hired Plaintiff in June 2012 as Assistant Regional Counsel.

12. The Plaintiff's job duties were criminal defense work.

13. Plaintiff was qualified for the position she has based on her experience and training.

14. As the Defendant is aware, Plaintiff is a woman.

15. The Plaintiff mistakenly began a personal relationship with Mr. Gentry Chambers, Investigator, in mid-to-late 2013. It was not public knowledge at the workplace that they were dating. In the fall of 2015, the Plaintiff suggested to Mr. Chambers that they break up, but he did not agree. After the Plaintiff and Mr. Chambers discussed it, they ended up continuing to date.

16. A few months later, in early 2016, the Plaintiff told Mr. Chambers that she wanted to break up with him. He responded angrily that they were not breaking up. However, the Plaintiff was successful in breaking up with him a few months later.

17. Mr. Chambers and the Plaintiff had to work closely together, since he was the only investigator in the office and since their two offices were connected. The Plaintiff actually had to walk through his office in order to access her office.

18. At work one day, Mr. Chambers, gave the Plaintiff photographs that depicted him as the subject of "wanted dead or alive" posters, with his hands positioned to form a gun, and the word "bang" on the photo with simulated bullet holes. The Plaintiff found these photographs concerning and threatening. The Plaintiff did not report this to the Defendant because Mr. Chambers previously claimed that he sometimes brought his handgun to work, and the Plaintiff was afraid of what would happen if she reported the incident.

19. After additional incidents with Mr. Chambers in 2016 and early 2017, the Plaintiff requested that her office be moved away from Mr. Chambers' office. The Defendant relocated Mr. Chambers' office to the 6th floor and the Plaintiff remained on the 7th floor. However, the

Plaintiff and Mr. Chambers had to continue to work together because he was the only investigator in the office.

20. Unfortunately, things deteriorated again in late 2019. The Plaintiff represented a client in a domestic violence matter. As the only investigator, Mr. Chambers was assigned to the case. After a phone call with the client, Mr. Chambers told the Plaintiff that some women "deserve" to be victims of domestic violence or that they bring domestic violence upon themselves because they are "annoying." Mr. Chambers took it even further by saying that Chris Brown was "probably right" to punch Rihanna because she was "probably annoying."

21. On October 3, 2019, Mr. Chambers was late in submitting an investigative report to the Plaintiff. The Plaintiff emailed Mr. Chambers asking him to submit it. He called the Plaintiff's office from his cell phone and yelled at her.

22. Around this time, Mr. Chambers began coming to the 7th floor and waiting outside of the Plaintiff's office at the end of the work day. After working hours, the Plaintiff was the only person on the 7th floor and she would hear Mr. Chambers come upstairs. Each time, he stood out of the Plaintiff's field of vision, just waiting. The Plaintiff was scared because she was otherwise alone and she believed he was armed based on his prior statements. The Plaintiff tried calling out to him a few times in the hopes that, if she acknowledged him, he would leave her alone. He responded by coming to the Plaintiff's office and just saying goodnight and leaving. Other times he came to the Plaintiff's office door without her ever calling out to him. After this happened on a few occasions, the Plaintiff stopped staying late at work and, instead, left with her coworkers.

23. On November 20, 2019, Mr. Chambers and the Plaintiff spoke via phone regarding their shared assistant, Ms. Parr. He began yelling at the Plaintiff that he hoped Ms. Parr was fired and he couldn't wait until it happened because she was a "bad assistant" and the "weakest part of

the team." The Plaintiff told him not to yell at her and countered that she was a good assistant. In response, he yelled "FUCK YOU" and hung up.

24. On December 16, 2019, Mr. Chambers came to the Plaintiff's office after conducting an intake interview of one of the Plaintiff's clients. He advised that there was another person involved in the crime and that the client wanted to testify against that person. When the Plaintiff asked Mr. Chambers for that person's name, he began yelling at her that he would not do that because it would put him "in harm's way" and that he felt he would be known as a "snitch" if the client went to prison, and then he stormed off. As the investigator on the file, it was his job to provide the Plaintiff with this information.

25. In the next few days, the Plaintiff verbally reported to her supervisor, Ms. Donoho, that Mr. Chambers was refusing to do the Plaintiff's investigations and specifically that he wouldn't get the name of the witness in her case. Ms. Donoho dismissed the Plaintiff's complaint as a personal problem based on the history between Mr. Chambers and the Plaintiff and said that she wasn't getting involved.

26. On March 3, 2020, Mr. Chambers called the Plaintiff's cell phone after work hours. He told the Plaintiff that he had been put into some kind of unannounced "supervisory role" at the office and needed her to talk to Ms. Parr because he had "already fixed all of the problems on the 3rd floor of the office," and Ms. Parr was his last remaining "problem" on the 6th floor. The Plaintiff told Mr. Chambers that she couldn't get involved in his difficulties with Ms. Parr. Ms. Parr was the Plaintiff's assistant and she felt that she was a good assistant, so if he had a problem with her, he needed to speak to her directly. Mr. Chambers started yelling at the Plaintiff. Again, the Plaintiff told him not to yell at her. And again, he screamed, "FUCK YOU," and hung up. The

Plaintiff called him back and when he didn't answer she texted him that his behavior was inappropriate.

27. On March 4, 2020, the Plaintiff verbally reported Mr. Chambers' behavior in person to Michael Orlando, Deputy Manager. The Plaintiff asked him to investigate the harassment as Ms. Donoho was out of the office on that date.

28. On March 6, 2020, the Plaintiff sent an email to Ms. Donoho and Mr. Orlando asking if she needed to report what had occurred with Mr. Chambers to Mr. Ryan. The Plaintiff had overheard Ms. Donoho and Mr. Orlando talking about a complaint Ms. Parr made about Mr. Chambers and they were saying they would deal with that today and leave the Plaintiff's complaint until another time. After the Plaintiff's email, she met with Ms. Donoho and verbally reported everything that had occurred to date with Mr. Chambers. During this meeting Ms. Donoho said it was Mr. Ryan's idea to make Mr. Chambers a supervisor, but nothing was official yet, and she was not necessarily in agreement with the idea. She told the Plaintiff that she told Mr. Chambers he couldn't flirt with the people he supervised.

29. Instead of conducting an investigation, Ms. Donoho began proposing theories as to why Mr. Chambers was harassing the Plaintiff, including that she believed he was "jealous" of her friendship with other coworkers. The Plaintiff advised her that Mr. Chambers and she were no longer friends. She forwarded the Plaintiff's email to Mr. Ryan, Assistant Director, and Gina Gillette, Administrative Director, but she asked the Plaintiff to send a group email correcting something she had said. She told the Plaintiff that, "friend to friend" she was disappointed in the Plaintiff's email because the Plaintiff had written that Regional Counsel District 4 ("RC-4") had a "policy of silence regarding harassment." She demanded that the Plaintiff send an email "correction" to explain that she was not speaking about her. Ms. Donoho told the Plaintiff that she

6

still has a boss that she reported to and the email made her look bad.  Based on her demand, the Plaintiff sent the email as requested.

30. Ms. Donoho reached out to the Plaintiff a few days later and told her that she told Mr. Ryan that the Plaintiff didn't want Mr. Chambers to be fired.  To the contrary, the Plaintiff did want Mr. Chambers to be fired and replaced with someone who would behave professionally and would not harass her.  Ms. Donoho was the one who didn't want Mr. Chambers fired.  The Plaintiff sent a group email to Mr. Ryan, Ms. Donoho, and Ms. Gillette explaining that what Ms. Donoho relayed did not accurately reflect the Plaintiff's position.

31. On March 12, 2020, the Plaintiff met with Mr. Ryan and Ms. Donoho and they told her that they were not going to fire Mr. Chambers, but, instead, that they instructed Mr. Chambers not to have contact with the Plaintiff, that they would assign her files to another investigator, that they would move his office to the 3rd floor that same day, that he would be prohibited from coming to the 6th and 7th floors from that day forward, that he would be prohibited from parking on the same floor of the garage where the Plaintiff parked, and that they were going to meet with him immediately after the meeting with the Plaintiff to discuss these items and implement them. Throughout the meeting Mr. Ryan lauded both Mr. Chambers and the Plaintiff as "quality employees."  Mr. Ryan offered the Plaintiff administrative leave for Friday and the following week, which she took.  He said that if the Plaintiff wanted to voluntarily seek counseling through the Defendant's Employee Assistance Program ("EAP"), she could do so.  He would have Ms. Gillette email the Plaintiff the EAP info, which she did.  Mr. Ryan also said that he and Ms. Donoho were going to discuss whether to send Mr. Chambers to some kind of anti-domestic violence class. In the same breath, Mr. Ryan went into a long explanation about how women sometimes bring domestic violence upon themselves. He also told the Plaintiff that, since Mr.

7

Chambers would be prohibited from speaking to her, if she wanted to speak to Mr. Chambers, she would first need to speak to Mr. Ryan. Mr. Ryan also repeatedly said that he thought the day would come when Mr. Chambers and the Plaintiff "could be friends again." The Plaintiff responded that she was not reporting the breakdown of a friendship; she was reporting harassment in the workplace. Ms. Donoho said that the Plaintiff should have reported the harassment sooner, and when the Plaintiff pointed out that she had tried to report it to her in December 2019, but she had dismissed her complaints, Ms. Donoho tried to make excuses. Ms. Donoho reiterated that she felt that this had to do with Mr. Chambers being jealous of the Plaintiff's friendships with coworkers.

33. After the meeting, the Plaintiff reached out to a counselor through the EAP and she ultimately attended three sessions with Dr. Campbell, who gave the Plaintiff advice on how to protect herself from further harassment and how to deal with the psychological effects of the harassment.

33. On March 17, 2020, Ms. Donoho sent an email letting everyone know that, because of upcoming renovations on the 6th floor, certain people, including Mr. Chambers, needed to remove personal items from their offices. From this email, it was apparent that, despite having informed the Plaintiff that they were both relocating Mr. Chambers to the 3rd floor and prohibiting him from accessing the 6th and 7th floors after March 12th, he was still working from an office on the 6th floor.

34. On March 18, 2020, the Plaintiff sent an email to Ms. Gillette, Mr. Ryan, Mr. Orlando and Ms. Donoho outlining the key points of the March 12th meeting and asking why they had not followed through on moving Mr. Chambers to the 3rd floor. The Plaintiff needed to visit her assistant's desk multiple times every day, and the desk was across from Mr. Chambers' 6th

floor office. The Plaintiff asked if they had implemented any of the measures discussed on March 12th.

35. On March 19, 2020, Mr. Ryan emailed the Plaintiff and represented that all of the measures were in place, but they had delayed moving Mr. Chambers's office until March 20th. In that email, Mr. Ryan said the reason he did not fire Mr. Chambers is because Mr. Chambers did not physically or verbally assault the Plaintiff. Thereafter, the Plaintiff sent a group email to the same group that she had changed her cell phone number in order to prevent Mr. Chambers from contacting her.

36. On June 2, 2020, the Plaintiff was on the 6th floor dealing with a printing issue. It was around 4:30 p.m. and the office was dark because the office closed at 3:00 p.m. due to Covid-19. As the Plaintiff was at the bottom riser of the staircase, right next to the door to the 6th floor, Mr. Chambers walked in and came within two feet of her. The Plaintiff was shocked to see him there since he should have been working from the 3rd floor and because he had been banned from the 6th floor. The Plaintiff was also scared because no one else was around. The Plaintiff immediately went up to the 7th floor and made a verbal report to Ms. Donoho. Her response was, "Geez, Anne. Let me see what's going on," in an annoyed tone. After she left, the Plaintiff sent a text to Mr. Ryan about the incident as well as the fact that she had just made a verbal report to Ms. Donoho. The Plaintiff also expressed her concern that Mr. Chambers and Ms. Donoho covered for each other. Mr. Ryan texted back that he was in the building and would come to the 7th floor.

37. At around 5:00 p.m. the Plaintiff met with Mr. Ryan and Ms. Donoho on the 7th floor. The Plaintiff was shaking and visibly upset. The Plaintiff asked him why Mr. Chambers was on the 6th floor after being banned. Despite Mr. Ryan having previously assured the Plaintiff

that Mr. Chambers was banned from the 6th floor, Mr. Ryan told the Plaintiff that Mr. Chambers wasn't banned. Mr. Ryan claimed that Mr. Chambers was on the 6th floor because he was helping another employee, despite the fact that no one else was on the 6th floor at the time. Mr. Ryan admitted that Mr. Chambers wasn't supposed to be on the 6th floor, but Mr. Ryan dismissed the interaction by focusing on the possibility of "incidental contact" between Mr. Chambers and the Plaintiff in elevators, the garage, or the building lobby. Mr. Ryan said he and Ms. Donoho had already spoken to Mr. Chambers before coming up to meet with the Plaintiff and that Mr. Chambers was instructed to go the other way and try to minimize incidental contact. The Plaintiff asked them to change the keypad access code for the 6th floor and to take away Mr. Chambers' key to the 7th floor. The Plaintiff informed them that she had utilized the EAP and that she feared Mr. Chambers would resort to physical violence and the counselor had advised her to avoid Mr. Chambers for her own protection. Mr. Ryan immediately dismissed the Plaintiff's concerns and told her he was sure Mr. Chambers would not be violent towards her. Mr. Ryan again said that a day would come where the Plaintiff would want to be friends with Mr. Chambers. Defendant continued to treat this matter as the disintegration of a friendship.

38. The next day, the Plaintiff emailed Mr. Ryan, Ms. Donoho, and Ms. Gillette requesting paid administrative leave for the remainder of the week as well as the following week. The Plaintiff also provided them with the photographs of Mr. Chambers on the wanted posters to further explain why she feared physical violence.

39. On June 6, 2020, Mr. Ryan responded that he would grant paid administrative leave for June 3rd through 5th, but that he would not do so for the following week. Instead, he told the Plaintiff if she was too unwell to work, she had to take sick leave, which she did.

40. That same day, the Plaintiff emailed Mr. Ryan, Ms. Donoho, and Ms. Gillette that, after the incident on June 2nd, she went to urgent care because she was feeling partial paralysis throughout her body. Urgent care felt that the Plaintiff's condition was probably caused by the stress of what was happening at work, but they wanted to rule out stroke/TIA, so they recommended a CT scan, which the Plaintiff obtained. Mr. Ryan responded that nothing from the EAP was binding on the agency, and that office management (despite not being physicians) did not find that the Plaintiff's medical condition was work-related. He also informed the Plaintiff that they had concluded their investigation and were making a finding that Mr. Chambers never harassed the Plaintiff. He commented on the Plaintiff's length of service and said that they think highly of her and hoped she could return to work soon. The Plaintiff took administrative leave on June 3rd through 5th and sick leave the following week. Then the Plaintiff began primarily working from home as the Defendant wouldn't take the steps it originally agreed to in order to prevent contact between the Plaintiff and Mr. Chambers.

41. On June 7, 2020, the Plaintiff emailed Mr. Ryan, Ms. Donoho, Mr. Orlando and Ms. Gillette asking follow-up questions, including inquiring as to who was assigned as investigator to the Plaintiff's cases. Since the Defendant refused to implement the measures previously agreed to, the Plaintiff also asked for Mr. Chambers' work schedule so that she could make every effort to avoid the "incidental contact," as Mr. Ryan described it. The Plaintiff also asked them to take away Mr. Chambers' key to the 7th floor and to change the door access code for the 6th floor. The Plaintiff never received a response to her email. On June 16, 2020, shortly after computers were stolen from the office, the Defendant changed the door code for the 3rd and 6th floors and emailed all employees, including Mr. Chambers, the new door code.

42. When the Plaintiff changed her phone number, she texted many employees to provide them with her new number and asked them not to give her number to Mr. Chambers. When the Plaintiff talked to another coworker, Mr. Moons, he commented that he had not seen her at work. The Plaintiff explained that she was working from home because she did not feel protected from Mr. Chambers. Mr. Moons said when the Plaintiff changed her number, he talked to Mr. Chambers and asked him why he was bothering the Plaintiff. Mr. Chambers denied bothering the Plaintiff but told Mr. Moons that the Plaintiff was a "fucking psycho bitch."

43. Despite the Plaintiff filing a charge with the EEOC on September 10, 2020, the discrimination continued.

44. As of September 2020, Mr. Chambers was still working on the Plaintiff's cases, despite the Defendant purportedly prohibiting him from contacting Plaintiff since March 2020.

45. Mr. Chambers interfered with the Plaintiff's authority to handle her own cases with her own clients. Specifically, on September 15, 2020, Mr. Chambers interfered with a mother of a client who had called to speak to the Plaintiff. Mr. Chambers did not transfer the call to the Plaintiff and did not note the call in the Defendant's case-management system as is standard procedure. This made it look like the Plaintiff was not taking necessary steps on her cases because, during that phone call between Mr. Chambers and the client's mother, Mr. Chambers made promises to the mother and then failed to keep those promises and did not provide any notes in the system.

46. The Defendant did not assign another investigator to the Plaintiff's cases until October 27, 2020. The Defendant said that it took them some time to locate and hire an investigator, but the investigator had been working with Mr. Orlando for years.

47. On September 22, 2020, a psychologist diagnosed the Plaintiff with PTSD as a result of being harassed at work by Mr. Chambers.

48. On December 14, 2020, Defendant assigned Mr. Orlando as Plaintiff's new supervisor, although Defendant never informed Plaintiff of this change.

49. On February 4, 2021, the Defendant asked Mr. Chambers to go the 6th floor to help with a screaming aggressive client, despite the fact that there were several other individuals in the office to help with the situation. The Defendant defended this by saying that Mr. Chambers was now allowed on the floors he previously was prohibited from as long as c Mr. Orlando or Ms. Donoho were there and approved of Mr. Chambers coming to the floor and verifying that the Plaintiff was not in the building.

50. Even to present day, Mr. Chambers still had the door code and a key to the Plaintiff's office.

51. Due to the continued discrimination, the Plaintiff gave her notice of resignation to the Defendant on June 4, 2021. The Plaintiff's last day will be July 5, 2021. She will work remotely throughout her notice period and has no intention of returning to the office.

52. Plaintiff has engaged the undersigned attorney to prosecute her claims and is entitled to recover her attorney's fees from Defendant pursuant to statute.

**COUNT I: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(Discrimination on the Basis of Gender)**

53. Plaintiff incorporates herein the allegations contained in paragraphs 1 through 52, inclusive, as though same were fully re-written here.

54. Plaintiff brings this action under Title VII for damages caused by Defendant's unlawful employment practices committed against Plaintiff because Defendant discriminated against Plaintiff based on her gender, female.

55. Mr. Chambers, Mr. Ryan, Mr. Donoho, and Mr. Orlando, at all times relevant, were acting within the course and scope of their employment for Defendant.

56. Because Plaintiff is a woman, she was discriminated against and harassed by Mr. Chambers, and the Defendant refused to take any action to prevent the discrimination and harassment.

57. Upon information and belief, similarly situated male employees are not treated in the same manner as Defendant treated Plaintiff.

58. Upon information and belief, similarly situated male employees are not permitted to be harassed by employees for the Defendant.

59. Upon information and belief, the Defendant takes seriously the complaints of similarly situated male employees.

60. Defendant engaged in unlawful employment practices in violation of Section 703(a)(1) of Title VII, 42 USC §2000e2(a)(1) which resulted in Plaintiff being discriminated against and harassed.

61. Plaintiff is entitled to such affirmative relief as may be appropriate, including but not limited to, lost wages, benefits, and compensation for emotional distress pursuant to the provisions of Title VII of the Civil Rights Act of 1964, §706(g).

WHEREFORE, Plaintiff hereby requests that this Court grant Plaintiff judgment against Defendant to compensate her for past and future pecuniary losses, including back pay, front pay, injury to her professional reputation, and emotional pain and suffering caused by Defendant's discriminatory treatment and harassment in an amount to be determined at trial and in accordance with Title VII of the Civil Rights Act of 1964, §706(g); attorney's fees, costs, together with interest thereon, and such other relief as the Court deems just and appropriate.

## COUNT II: VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992
### (Discrimination on the Basis of Gender)

62. Plaintiff incorporates herein the allegations contained in paragraphs 1 through 52, inclusive, as though same were fully re-written here.

63. The FCRA forbids discrimination on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.

64. The Florida Civil Rights Act of 1992 shall be construed according to the fair import of its terms and shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved.

65. Plaintiff is a woman, and therefore a member of a protected class.

66. Mr. Chambers, Mr. Ryan, Mr. Donoho, and Mr. Orlando, at all times relevant, were acting within the course and scope of their employment for Defendant.

67. Because Plaintiff is a woman, she was discriminated against and harassed by Mr. Chambers, and the Defendant refused to take any action to prevent the discrimination and harassment.

68. Upon information and belief, similarly situated male employees are not treated in the same manner as Defendant treated Plaintiff.

69. Upon information and belief, similarly situated male employees are not permitted to be harassed by employees for the Defendant.

70. Upon information and belief, the Defendant takes seriously the complaints of similarly situated male employees.

71. At all relevant and material times, Defendant failed to comply with the FCRA.

72. At all times relevant, including at the time of the unlawful and discriminatory treatment and harassment, Defendant was aware that Plaintiff was a woman.

73. At the time of the unlawful discrimination and harassment, Plaintiff did perform and excel at the performance of the essential functions assigned to her by the Defendant.

74. The failure of Defendant to adhere to the mandates of the FCRA was willful and its violations of the provisions of the FCRA were willful.

75. Defendant, through its practices and policies as an employer, willfully, and with malicious or reckless disregard of Plaintiff's protected rights, discriminated against Plaintiff on account of her being a woman in violation of the FCRA with respect to its decision to treat Plaintiff differently from other employees.

76. Defendant's treatment of Plaintiff was directly and proximately caused by Defendant's unjustified discrimination against, and harassment of, Plaintiff because she is a woman, in violation of the FCRA.

77. Any allegedly nondiscriminatory reason for the treatment of Plaintiff asserted by Defendant is a mere pretext for the actual reasons for the treatment; namely, Plaintiff being a woman. Defendant's actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from discrimination due to her sex. The discrimination on the basis of sex constitutes unlawful discrimination and harassment.

78. As a direct and proximate result of Defendant's intentional conduct, Plaintiff has suffered economic losses, as well as mental pain and suffering.

WHEREFORE, Plaintiff hereby requests this Court enter judgment against the Defendant for all wages and benefits the Plaintiff would have received but for the discrimination, including actual damages suffered, compensatory damages under the FCRA for embarrassment, anxiety, humiliation, and emotional distress, prejudgment and post-judgment interest, attorney's fees, costs, and such other and further relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 7th day of June, 2021.

By: /s/ *Michelle Cohen Levy*
Michelle Cohen Levy, FBN 0068514
The Law Office of Michelle Cohen Levy, P.A.
4400 N. Federal Highway
Lighthouse Point, Florida 33064
P: (954) 651-9196
Michelle@CohenLevyLegal.com
Counsel for Plaintiff